**In re ESTATE OF Louis Frank MONTESI.**

**Rita MONTESI, Plaintiff-Appellee,**

v.

**ESTATE OF Louis Frank MONTESI, Defendant-Appellant.**

Supreme Court of Tennessee, at Jackson.

Dec. 26, 1984.

David E. Caywood, Thomas T. Woodall, Memphis, for plaintiff-appellee.

Michael A. Robinson, Steven H. McCleskey, Memphis, for defendant-appellant.

## OPINION

HARBISON, Justice.

In this case Rita Montesi, estranged wife of the decedent, Louis Frank Montesi, filed a dissent from the decedent's will and claimed her elective share as a surviving spouse pursuant to T.C.A. §§ 31-4-101 through 105. The Probate Judge sustained objections filed by the Executor upon the ground that Mrs. Montesi was not a "surviving spouse" because of a prior property settlement agreement entered into between her and the decedent. *See* T.C.A. § 31-1-102(b)(3).

The Court of Appeals reversed and this Court granted further review. We are of the opinion that the Court of Appeals correctly construed and interpreted the statutory provisions involved. However, we are also of the opinion that all property rights of Mrs. Montesi are governed by the settlement agreement and that she is not entitled to dissent and claim an elective share.

### A. *The Factual Background*

There is no dispute concerning the relevant facts in this case. Mr. and Mrs. Montesi were married on December 27, 1975. This was his fourth marriage and her second. He was fifty-seven years of age and she was twenty-nine. He had five children by a previous marriage, and they are the beneficiaries named in the will from which Mrs. Montesi has filed a dissent.

Mr. and Mrs. Montesi separated during the fall of 1977. On October 26, 1977, twenty-two months after their marriage, they executed the settlement agreement at issue in this case.

In the probate court Mrs. Montesi testified that the parties had separated because Mr. Montesi was an alcoholic and that when he drank he became violent and threatened her. She said that he told her on several occasions that if she wished to leave him, she could do so but that he would not permit her to take any property with her and that she would have to go empty-handed.

It was under those circumstances that she consulted with an attorney in Memphis, who represented the large grocery store chain in which Mr. Montesi was a substantial stockholder. This attorney drafted the agreement which the parties executed.

Mrs. Montesi testified that Mr. Montesi had apologized to her and stated that he was sorry for his past misconduct and that he was going to stop drinking. He professed that he was still fond of her and sought a reconciliation.

Following execution of the agreement the parties did become reconciled, and Mr. Montesi transferred very substantial assets, both real and personal, to Mrs. Montesi, either outright or as a tenant by the entirety. The terms and provisions of the agreement will be discussed in more detail subsequently.

Mrs. Montesi testified that at the time of the execution of the October 1977 agreement, Mr. Montesi already had in effect a will leaving her one-half of his estate. She said that the parties had discussed this in March 1977 because Mr. Montesi told her that if he did not include her in his will in this fashion, she would only receive a "child's share" since he had five children by a previous marriage.

The reconciliation between the parties continued for about two and one-half years, or until May 1980. Mrs. Montesi testified that the decedent continued to drink from time to time and that when he did so he would threaten her. She said that the threats became more serious in May 1980,

so that she separated from him. On June 3, 1980 she filed a complaint for divorce. She testified that she did so because Mr. Montesi would not provide her with funds or with household furnishings. She testified that he harassed her at her work. She called upon him to make payments to her as provided under the terms of the settlement agreement, but he refused to do so. Accordingly she sought enforcement of that agreement in the divorce proceedings, and she was awarded a pendente lite support decree requiring monthly payments in the same amount as those provided in the settlement agreement. The divorce court, however, expressly refrained from attempting to enforce the agreement pendente lite.

Mrs. Montesi testified that she left Mr. Montesi on May 16, and that thereafter he was hospitalized until the latter part of June 1980 for alcoholism. In October 1980 his attorneys filed an answer and counterclaim in the divorce proceedings, and in this document Mr. Montesi attempted to repudiate the 1977 settlement agreement.

Despite this, however, Mrs. Montesi testified that she and Mr. Montesi "started seeing each other and started spending time together and going out" after he was released from the hospital. She testified:

"A. ... In the daytime we would play golf and go to the show and stuff like that during the day, and at night we went out to dinner and that sort of thing. We just spent our time together.

Q. Did you ever travel with him?

A. Oh, yes.

Q. When did you travel with him?

A. Well, let's see. He got out of the hospital the last of June, so we went to New York in December, and we stayed up there for, I think, ten days.

Q. Now, is this December 1980?

A. Yeah.

Q. Did you live together as husband and wife during that trip?

A. Oh, yes.

Q. All right. Following that trip did you travel with him?

A. Yes. Then in June, I think it was, of '81 we went to the Breakers Hotel in Palm Beach and we stayed there for another week or ten days. And then in November we went back to New York and stayed at the Plaza for another week.

Q. Is this November 1981?

A. Yeah. November. And then in December we stayed a couple of days at the Peabody, of '81."

Mr. Montesi died a few months later, on March 3, 1982. The will from which Mrs. Montesi sought to dissent was dated July 12, 1980, not quite two months after the time of their separation, and about a month after she had filed her divorce action.

The divorce case was never tried, and apparently it remained dormant after the pendente lite hearing. Mr. Montesi paid Mrs. Montesi the pendente lite support award, in the amount of $1,000 per month, until his death. As stated previously, this was the same monthly support provided for in the settlement agreement. In addition Mr. Montesi gave his wife numerous gifts. She testified that in December of 1981 he bought her a new fur coat, and that he was constantly urging her to resume their marriage relationship. Just before he died he offered to purchase an automobile for her. She testified:

"He wanted me to come back home. There is no doubt of that."

She testified, however, that he was not able to stop drinking except for short periods of time. At the time of Mr. Montesi's death, Mrs. Montesi lived separately from her husband and had in her possession a number of items of personal property which she said belonged to him, including his 1981 Cadillac automobile.

### B. The Settlement Agreement

This document, upon which resolution of the litigation turns, is entitled, "RECONCILIATION AND PROPERTY SETTLEMENT AGREEMENT." It consists of a little over three pages, and was executed by Mr. and Mrs. Montesi on the fourth page. Their signatures were witnessed. Attached to it was a thirteen-page schedule of items of personal property, all but a few of which were to be delivered to Mrs. Mon-

tesi and were to be her sole property thereafter. This portion of the agreement was carried out, and insofar as the record reveals Mrs. Montesi has all of these items in her possession. The value of this extensive list of personal property is not shown in the record, but an examination of the contents of the list reveals that the total value of the property transferred to her under this schedule must have been substantial.

The agreement contains four paragraphs of recitals, stating that the parties were estranged and separated, and that each was contemplating a divorce from the other. It recites that the parties desire to become reconciled and jointly to attempt to preserve their marriage. It then continues:

"WHEREAS, disputes and uncertainties relating to property are among the principal causes of controversy and mistrust between the parties and

"WHEREAS, it is their mutual desire to settle property rights as between the parties in the event of a successful reconciliation or in the event that reconciliation fails and renewed separation and/or divorce between the parties occurs."

The agreement recites that in consideration of these premises and in consideration of the mutual promises and obligations thereafter undertaken, the parties had agreed to the following:

1. That they would resume cohabitation promptly following execution of the agreement.

2. That the husband would within five days convey to his wife an estate as tenant by the entirety in the residence of the parties situated at 2238 Hickory Crest, Memphis, Tennessee. He further agreed that when he became sixty-five years of age he would convey all of his right, title and interest in the residence to the wife.

3. Mr. Montesi agreed to execute and keep in force a valid will providing that if the parties were living together as husband and wife at the time of his death, she should receive not less than one-half of his net estate.

4. Mr. Montesi agreed that within five days following execution of the agreement he would transfer to his wife 1000 shares of stock in the grocery corporation in which he was a large stockholder. On each anniversary date following execution of the agreement, he agreed to convey an additional two hundred fifty shares of stock, provided that upon the anniversary date the parties were then living together as husband and wife. As long as they continued to live together as spouses, Mrs. Montesi agreed to execute and keep in effect a proxy under which Mr. Montesi could vote the shares and receive all dividends thereon, to be available to him for the general living expenses of the parties. The agreement stated, however, that in the event of separation or divorce, Mrs. Montesi could revoke the proxy and receive for her separate use any dividends on the shares thereafter.

5. "In the event of failure of the reconciliation and subsequent separation of the parties," it was agreed that Mr. Montesi would be privileged to live in the residence of the parties for a period of up to six months, during which time the residence would be listed for sale. The net proceeds from the sale were to be divided equally between the parties. All of the household items, including china, crystal and silver, were to become the property of Mrs. Montesi, and the extensive list of these was attached as a schedule, as above stated.

6. It was agreed that in the event of a separation lasting for as long as thirty days, at any time subsequent to execution of the agreement, Mr. Montesi would begin paying the sum of $1000 per month to Mrs. Montesi "while said separation continues." The payments were to be made for the period of the separation, not to exceed sixty months following the first payment. They were to cease upon remarriage of Mrs. Montesi during the sixty month period.

7. This paragraph dealt with the eventuality of divorce and provided as follows:

"In the event of separation for as long as thirty (30) days following this reconciliation, the parties are mutually agreed that irreconcilable differences exist between them and either may obtain a di-

vorce from the other upon such grounds or such other grounds as may exist at law and in the event of any such divorce at the instance of either party, the property rights of the parties shall have been fully settled and satisfied by the performance of the obligations hereinabove set out and neither party shall have any further or other claim against the other as an incident of such divorce or otherwise."

8. It was agreed that the document should be governed by the laws of Tennessee, "and more particularly as expressed in the opinion of the Supreme Court in *Hoyt v. Hoyt*, 213 Tenn. 117, 372 S.W.2d 300, a copy of which is annexed hereto and made an exhibit to this agreement." The document concluded with an acknowledgment by both parties that they had had opportunity and encouragement to obtain independent legal counsel as to the legality and effect thereof.

### C. *Proceedings Below*

After a full hearing on the objections filed to Mrs. Montesi's dissent, including a stipulation of facts and oral testimony, the Probate Judge filed a memorandum opinion. He held:

"... The agreement was a valid separation agreement which stated that it was in settlement of all questions and claims concerning the property of the parties.

"In the Reconciliation and Property Settlement Agreement, Rita Montesi received a substantial settlement of the parties' property which had been consummated in almost all respects."

He concluded that the agreement satisfied all of the property rights of the parties and that Mrs. Montesi was therefore not entitled to dissent from Mr. Montesi's last will.

The Court of Appeals reversed. It concluded that the transfer of the residence, personal property and stock to Mrs. Montesi "were to be met upon reconciliation and were not in material part otherwise conditioned."

The Court of Appeals further found that the agreement provided for the disposition of the property of the parties in the event of a divorce, but did not make a permanent disposition of the rights of Mrs. Montesi in the event the reconciliation failed but that no divorce was obtained. The court stated:

"It is our interpretation of the agreement that the parties intended that if the reconciliation was unsuccessful, the agreement would terminate and settle all marital rights upon the happening of that eventuality *and* a divorce. The parties did not intend that it was to be a settlement of all rights in any event, but only was to operate as such in both events. From a reading of the entire instrument it is evident to this Court that the parties never conceived of another separation without a divorce."

The Court of Appeals concluded:

"We hold that the reconciliation agreement intended to settle or terminate all matters conditioned upon a separation *and* a divorce. Since the divorce did not occur, and the parties were married at the time of the husband's death, there was no agreement that unconditionally settled all marital rights."

The Court of Appeals also indicated that Mr. Montesi's estate was very nearly estopped because of his attempt to repudiate the agreement in the divorce proceedings.

### D. *Our Conclusions*

As discussed in the opinions of both courts below, reconciliation agreements between married parties who are separated have been held valid in this state and not contrary to public policy. This was emphasized in the agreement itself, because express reference was made to the decision of this Court in *Hoyt v. Hoyt*, 213 Tenn. 117, 372 S.W.2d 300 (1963), and a copy of the opinion in that case was attached to the agreement itself. In that case the trial court had held that such an agreement was not contrary to public policy and was enforceable. After granting review, this Court affirmed, stating that the agreement was not necessarily conducive to divorce or collusive with respect to divorce proceedings. The Court said:

"We have a husband and wife, mature in age, each having been previously

married, each having children from previous marriages, who have now reached the point in their own marriage where the wife has a divorce action pending against the husband. Under such circumstances these parties, each represented by counsel, have begun negotiations to the end this contract was executed, which had the apparent present intention of effecting a reconciliation of the parties. It is apparent from the contract property was one of the principal causes of friction between the parties, and by this contract they attempted to settle this matter between themselves for the present and the future." 213 Tenn. at 124–125, 372 S.W.2d at 303.

The Court held that in the absence of fraud or other vitiating circumstances, an agreement entered into by separated spouses was not in violation of the public policy of the state, even though it contained terms which might make provision for future divorce or separation. The Court emphasized that the wife, who was seeking to repudiate the agreement, had received assets in the amount of $45,000 under the terms of the agreement.

In the present case the Court of Appeals was called upon to construe the provisions of T.C.A. § 31–1–102, enacted as part of 1977 Tenn.Pub.Acts, ch. 25. This statute contains provisions concerning the effect of divorce or annulment upon persons who might otherwise qualify as a surviving spouse. Subsection (b) provides that a surviving spouse does not include:

"... (3) A person who was a party to a valid property settlement agreement or a valid proceeding concluded by an order purporting to terminate all marital property rights."

Although the grammar is difficult and there is no punctuation within this clause, the Court of Appeals held that only where a property settlement agreement purported to terminate all marital rights would the survivor be precluded from asserting his or her right to dissent. It is insisted by the Executor that the phrase "purporting to terminate all marital property rights" modifies only the words "a valid proceeding

concluded by an order" and does not modify the term "a valid property settlement agreement." In other words, it is insisted by the Executor that any valid property settlement agreement between spouses constitutes a waiver of all rights as a surviving spouse.

■ The Court of Appeals held otherwise, and we are of the opinion that that decision was correct. There might be valid property settlement agreements between spouses executed for limited purposes, and some of these could affect only a small portion of the total assets of the parties. We are of the opinion that only if the agreement purports to conclude all marital rights and to effect a full settlement thereof under all contingencies would it have the effect of waiving the right to dissent or other rights of a surviving spouse.

We are of the opinion, however, that it was the intention of the parties in this case to effect such a settlement, and that the settlement was not conditioned solely and alone upon the obtaining of a divorce. We agree with the Court of Appeals that the terms of paragraph 7 of the agreement, dealing with divorce, clearly provide that if a divorce is obtained by either party, all of the rights to which either party is entitled are spelled out and set forth in the agreement itself.

It is conceded by Mrs. Montesi that had the reconciliation between the parties been permanent, the agreement did effect a full settlement. She was to receive one-half of the net estate under the will, as well as the residence by survivorship, together with all of the personal property and stock transferred to her.

It is her insistence, however, that all of these transfers were made to her in consideration of the reconciliation, and that no provision whatever was made for her in the event of Mr. Montesi's death during a renewed separation without a divorce. The Court of Appeals so held. We are unable to construe the agreement to this effect.

In the first place, we find nothing in the agreement stating that the transfers to

Mrs. Montesi were made solely in consideration of the reconciliation. They were made to her outright and in all events as a part of the entire agreement. She was made a tenant by the entirety in the residence—an estate which, by its very definition, carries a right of survivorship if Mr. Montesi were to die first. This has occurred, and we assume that she has received the residence, said to be valued at about $140,000 for estate tax purposes. In the second place she was to receive substantial transfers of stock. These were carried out, and indeed were greater than called for in the agreement. Mr. Montesi transferred to her 1000 shares immediately, 250 shares on the first anniversary of the agreement and 500 shares on the second anniversary. She thus received 1750 shares of stock in the grocery, said to be valued at over seventy dollars per share for estate tax purposes, or about $123,000. She received all of the extensive personal property listed in a thirteen-page schedule, as previously stated, and all of this property was to be hers outright, whether there was a separation or a permanent reconciliation. Further, it was agreed that in the event there was a further separation between the parties lasting for as much as thirty days, she was to receive $1000 per month for a period up to five years. This was to terminate at the end of five years, whether the parties had been divorced or not.

As quoted previously, at its very inception the agreement provided that it was executed out of the mutual desire:

> "to settle property rights as between the parties in the event of a successful reconciliation or in the event that reconciliation fails and renewed separation and/or divorce between the parties occurs."

The various transfers of property made to Mrs. Montesi, estimated at over $200,000 not including the value of the personal effects, were not made solely in consideration of the reconciliation but were an integral part of the entire agreement. She was provided for in the event of his death, both by transfer of the residence to a survivorship estate and by transfer of virtually all of the tangible personal property and of stock having a very substantial value.

If the reconciliation had remained permanent, Mr. Montesi had made further provision for Mrs. Montesi by his will as required. He did not change this until after they had separated and she had sued for divorce. In the event the reconciliation failed and there was a separation at the time of his death, she was entitled to retain all of the assets he had transferred into her control. Upon their separation, she was entitled to revoke the proxy and to exercise control of the corporate shares which already stood in her name.

■ We are of the opinion that the probate court correctly construed the agreement and that it should be carried out as written. We find no basis for an estoppel on the part of either of the parties. The divorce court did not rule upon the validity of the agreement, and no transcript of the testimony heard by the divorce court has been preserved. Mrs. Montesi insisted in the divorce proceedings that the agreement did represent a full and equitable settlement of her marital rights, and she sought its enforcement. She concedes that she would not have been entitled to anything else from Mr. Montesi in the event of a divorce but insists that she is entitled to much more than the agreement has already provided for her in the event that there was a continued separation without a divorce. We cannot so construe the agreement, because we do not think that this was the intention or expectation of either party.

■ We find no basis for an estoppel against Mr. Montesi. It is true that he sought to repudiate the agreement because he challenged its legal effect and also claimed duress, coercion or collusion. There was no factual or legal finding to this effect in the divorce proceedings, and his alleged testimony as to his own legal conclusions or opinions is certainly not binding on his executor. The cases cited by the Court of Appeals dealt with situations where there had been an adjudication in one case and an attempt to avoid that

adjudication in another[1] or where one entitled to make an election of remedies had done so in an irrevocable manner.[2] That is not the situation here.

We are of the opinion that the probate court correctly held that the agreement effected a full settlement of all marital property rights of Mrs. Montesi. It was suggested by counsel for Mrs. Montesi that Mr. Montesi had failed to carry out his obligations or to comply fully with the agreement. If so, or to such extent as this can be shown, Mrs. Montesi is free to proceed on an alternate claim which she has filed against the estate seeking full enforcement of the agreement.

The judgment of the Court of Appeals is reversed and that of the Probate Court is reinstated. The cause is remanded to the Probate Court for such further proceedings as may be necessary. In our discretion we tax all costs of these proceedings to the estate.

COOPER, C.J., and FONES, BROCK and DROWOTA, JJ., concur.

---

1. *Tidwell v. Chattanooga Boiler & Tank Co.,* 163 Tenn. 420, 43 S.W.2d 221 (1931)

2. *E.g., Montlake Coal Co. v. Chattanooga Co., Ltd.,* 137 Tenn. 440, 193 S.W. 1057 (1917). This and other authorities cited by the Court of Appeals were decided before adoption of Rule 8.05(2) T.R.C.P. expressly permitting alternative pleadings "regardless of consistency."